No. 24-1942

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, *et al.*,
*Plaintiffs-Appellants,*

v.

UNITED STATES ARMY CORPS OF ENGINEERS, CHARLESTON
DISTRICT, *et al.*,
*Defendants-Appellees*

and

TRACT 1 TIMER, LLC, *et al.*,
*Defendants-Intervenors-Appellees.*

On Appeal from the United States District Court for the District of South Carolina
(Civ. No. 2:22-cv-2727)
(The Honorable Richard M. Gergel)

**BRIEF OF DEFENDANTS-INTERVENORS-APPELLEES TRACT 1
TIMBER, LLC; SEVEN STICKS, LLC; TRACT 7, LLC; and CAINHOY
LAND AND TIMBER, LLC**

M. Rhett DeHart (Fed. ID No. 7777)
Womble Bond Dickinson (US) LLP
5 Exchange Street
Charleston, SC  29401
Tel.  (843) 722-3400
RhettDehart@wbd-us.com

# **DISCLOSURE STATEMENT**

The Defendant-Intervenors have no parent corporations, and no publicly held companies own 10 percent or more of its stock.

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ...................................................................2

TABLE OF CONTENTS ....................................................................... i

TABLE OF AUTHORITIES ................................................................ iii

STATEMENT OF THE ISSUES ............................................................1

SUMMARY OF THE ARGUMENT ......................................................1

STATEMENT OF THE CASE ..............................................................2

    I. Facts and proceedings ..............................................................2

        A.    Legal framework ...................................................8

LEGAL STANDARD .........................................................................8

ARGUMENT ....................................................................................9

    I. The District Court correctly found that the Appellants were not
        likely to succeed on the merits of their ESA claims because a
        habitat surrogate was necessary in this case............................9

        A.    The lack of NLEBs on or near Cainhoy shows that it is
           not practical for the BioP to have a numeric take limit for
           NLEBs or to monitor the take of this species. ...........9

        B.    The BioP sets a clear standard for determining when the
           level of anticipated take has been exceeded. ...........20

        C.    The BioP describes the causal link between the habitat
           surrogate and the take of NLEBs. ...........................21

    II.    The District Court correctly found that the Appellants were not
        likely to succeed on the merits of their NEPA claims.................24

        A.    The Federal Defendants took the required "hard look" at
           the environmental consequences of the Cainhoy
           Development, and there is nothing to be gained from an
           Environmental Impact Statement...............................24

    III.   The Appellants have not shown irreparable harm and cannot
        show that the district court was clearly erroneous in finding so. ........34

    IV.   The Appellants cannot show that the district court was clearly
        erroneous in finding that the Balance of Equities and the Public
        Interest "weighs heavily in favor of the Defendants." .........................40

CONCLUSION ................................................................................................44

CERTIFICATE OF COMPLIANCE.......................**Error! Bookmark not defined.**

# TABLE OF AUTHORITIES

## Cases

*Appalachian Voices v. United States Dep't of Interior,*
   25 F.4th 259 (4th Cir. 2022)      15

*Atchafalaya Basinkeeper v. United States Army Corps of Engineers*,
   894 F.3d 692 (5th Cir. 2018) ..........................................................................36

*City of Santa Clarita v. U.S. Dep't of Interior,*
   No. CV:02-00697, 2006 WL 4743970, (C.D. Cal. 2006) ...........................16

*Compare Friends of Black Bay v. United States Army Corps of Engineers*,
   681 F.3d 581 (4th Cir. 2012) .........................................................................36

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
   422 F. Supp. 2d 1115 (N.D. Cal. 2006)........................................................22

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
   952 F.2d 802 (4th Cir. 1991) .........................................................................37

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)........................................................................................10

*Heartwood v. Kempthorne,*
   No. 1:05-cv-313, 2007 WL 1795296, (S.D. Ohio 2007).............................16

*Indigenous Env't Network v. United States Dep't of State*,
   347 F. Supp. 3d 561 (D. Mont. 2018) ..........................................................31

*Mahmoud v. McKnight*,
   102 F.4th 191 (4th Cir. 2024) ............................................................... 11, 38

*Miccosukee Tribe of Indians of Fla. v. United States*,
   697 F. Supp. 2d 1324 (S.D. Fla. 2010).........................................................15

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)........................................................................................27

*Mountain Valley Pipeline*, 915 F.3d at 218 .........................................................42

*Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. FERC*,
   143 F.3d 165 (4th Cir. 1998) ................................................................ 28, 35

*Nat. Res. Def. Council, Inc. v. Evans*,
　279 F. Supp. 2d 1129 (N.D. Cal. 2003) ........................................................22

*Native Ecosystems Council v. Krueger*,
　40 F. Supp. 3d 1344 (D. Mont. 2014) ..........................................................38

*Northwest Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.*,
　647 F. Supp. 2d 1221 (D. Or. 2009) .............................................................16

*Ohio Valley Env't Coal. v. Aracoma Coal Co.*,
　556 F.3d 177 (4th Cir. 2009) ............................................................... passim

*Oregon Nat. Res. Council v. Allen*,
　476 F.3d 1031 (9th Cir. 2007) ......................................................................22

*Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
　538 F. Supp. 2d 242 (D.D.C.2008) ...............................................................16

*Pierce v. N. Carolina State Bd. of Elections*,
　97 F.4th 194 (4th Cir. 2024) .................................................................. 11, 26

*Rio Associates, LP v. Layne*, No. 3:15-CV-00012, 2015 WL 3546647 (W.D.
　Va. June 8, 2015) ..........................................................................................45

*Roanoke River Basin Ass'n v. Hudson*,
　940 F.2d 58 (4th Cir. 1991) ..........................................................................35

*S.C. Dep't of Wildlife & Marine Resources v. Marsh*,
　866 F.2d 97 (4th Cir. 1989) ..........................................................................37

*Scotts Co. v. United Industries Corp.*,
　315 F.3d 264 (4th Cir. 2002) ................................................................. 37, 38

*Sierra Club v. U.S. Dep't of the Interior*,
　899 F.3d 260 (4th Cir. 2018) ............................................................... passim

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
　No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933 (M.D. Fla. Nov. 1,
　2023) ............................................................................................................16

*State of S.C. ex rel. Campbell v. O'Leary*,
　64 F.3d 892 (4th Cir. 1995) ..........................................................................35

*Water Legacy v. USDA Forest Serv.,*
    No. 17-CV-276 (JNE/LIB), 2019 WL 4757663 (D. Minn. Sept. 30,
    2019) ............................................................................................................21

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................. passim

*Winter*, 555 U.S. at 27 ...............................................................................42

*Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*,
    872 F.2d 75, 80 (4th Cir. 1989)……………………………………………...35

*Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam)………………………35

*Friends of Animals v. United States Bureau of Land Mgmt.,*
    232 F. Supp. 3d 53, 65 (D.D.C. 2017)……………………………………...35

*FS Med. Supplies, LLC v. Tanner Pharma UK Ltd.*,
    No. 23-cv-000598, 2023 WL 6812565, at *4 (W.D.N.C. Oct. 16, 2023)….35

## Statutes

33 U.S.C. § 1344 ........................................................................................8

40 C.F.R. § 1501.4(b) (2008) ...................................................................27

5 U.S.C. § 706(2)(A)................................................................................10

50 C.F.R § 402.14.(i)(4)............................................................................23

50 C.F.R. § 402.14(i)(1)(i)........................................................................12

## STATEMENT OF THE ISSUES

**I.**    Did the District Court abuse its discretion when it found that the Appellants were not likely to succeed on the merits of their ESA claims because a habitat surrogate was necessary and proper in this case?

**II.**    Did the District Court abuse its discretion when it found that the Appellants were not likely to succeed on the merits of their NEPA claims when the Appellants did not cite a single case where an Environment Impact Statement was required for a private residential development?

**III.**    Did the District Court abuse its discretion when it found that "I certainly don't believe [Appellants] have shown irreparable harm?"

**IV.**    Did the District Court abuse its discretion when it found that the Balance of Equities and the Public Interest factors "weighs heavily in favor of the Defendants?"

## SUMMARY OF THE ARGUMENT

The District Court did not abuse its discretion when it found that the Appellants were not likely to succeed on the merits of their ESA claims because a habitat surrogate was necessary and proper in this case.

The District Court did not abuse its discretion when it found that the Appellants were not likely to succeed on the merits of their ESA claims when the Federal Defendants took the requisite "hard look" for more than six years at the environmental consequences of this development.

The District Court did not abuse its discretion when it found that the Appellants were not likely suffer irreparable harm absent an injunction.

The District Court did not abuse its discretion when it found that the Balance of Equities and the Public Interest factors "weighs heavily in favor of the Defendants" and against an injunction?

## STATEMENT OF THE CASE

### I. Facts and proceedings

In the 1930s and 1940s, the Defendant-Intervenors' family bought approximately 16,000 acres in Berkeley County, South Carolina as farmland and hunting land. JA 1293-94. This included Daniel Island and the Cainhoy Peninsula ("Cainhoy"). *Id.* The Defendant-Intervenors used Daniel Island as a cattle farm and Cainhoy as a timber farm. *Id.* For the last 90 years, Cainhoy has operated as a pine-tree timber farm, which remains in operation to this day.

In 1991, Charleston Mayor Joseph P. Riley led the annexation of Daniel Island into the City of Charleston. JA 458-61. The City annexed Daniel Island without notice to the Defendant-Intervenors. After initial reservations, the Defendant-Intervenors, in Mayor Riley's words, "acquiesced" in the annexation of Daniel Island. *Id.* Given the small size of the Charleston Peninsula, Mayor Riley (and later Mayor John J. Tecklenburg) viewed Daniel Island and Cainhoy as the best options for the future growth of the City. *Id.* and JA 462-63.

Daniel Island has won numerous planning awards, including America's Best Suburban Smart Growth Community. JA 530-533. Daniel Island is relevant to this case because the same professionals who developed Daniel Island are developing Cainhoy. JA 458-61. As Mayor Riley has noted, the Defendant-Intervenors "approached the planning of their Cainhoy property with the same high standards and goal of excellence as they did for Daniel Island." *Id.*

In 1996, the City of Charleston annexed the Cainhoy Peninsula. JA 1294. At Mayor Riley's request, the Defendant-Intervenors did not contest the annexation of Cainhoy. In 2014, Charleston incorporated Cainhoy into the city's urban growth boundary in a unanimous city council vote. JA 458-61. As Mayors Riley and Tecklenburg made clear, the City viewed Daniel Island and Cainhoy as the most environmentally responsible areas for Charleston to grow. *Id.* & JA 462-63.

The Cainhoy tract is 9,037 acres, approximately half of which are wetlands. JA 1304. As the Army Corps of Engineers noted in the environmental assessment, the Defendant-Intervenors "emphasized that they wanted a conservation-minded and environmentally sensitive development project." JA 1413. Consistent with this goal, the Defendant-Intervenors will develop no more than 3,906 acres of the 9,037-acre property. The Defendant-Intervenors will place the remaining acres in conservation easements or restrictive covenants to protect the property. JA 1420. Cainhoy is the last major tract of undeveloped land in the City of Charleston and

presents the last chance for home construction on a meaningful scale within the City. JA 1413.

Since the annexation of Cainhoy in 1996, the City of Charleston, the County of Berkeley, and the State of South Carolina have provided substantial infrastructure on Cainhoy. JA 530-33. In 2012, the City of Charleston asked the Defendant- Intervenors to allow three public schools (K-12) to be built on Cainhoy, and the Defendant- Intervenors agreed long before the permit for this project was issued. JA 462-63. Another public school is purchasing land on Cainhoy. JA 530-33. As noted in the environmental assessment: "Within the past 10 years, the land use of the area has experienced a shift from largely rural and agricultural lands to residential use as the population of the City of Charleston and surrounding areas continue to increase." JA 1294. There is already a thriving community on Cainhoy, including 1,000 residents, a Publix grocery store, retail shops, service firms, and two apartment complexes. JA 1296.

In 2012, the Defendant-Intervenors began the process of applying for permits for the Cainhoy development. For more than a decade, the Defendant-Intervenors and their environmental and engineering consultants worked closely with the Army Corps of Engineers ("Corps") and the Fish and Wildlife Service ("FWS") ("Federal Defendants"). From the outset, the Corps placed strict demands on this project to ensure full compliance with federal environmental laws. For example, the Corps

required the Defendant-Intervenors to apply for a single permit for all 9,076 acres on Cainhoy, even though four separate entities own different parts of Cainhoy. As the Corps noted, "the four individual landowners submitted a joint single permit application that master planned approximately 9,000 acres. *This was an enormous undertaking which greatly complicated the planning and expense to the Applicants; however, it resulted in substantially greater ecological benefits as will be discussed below.*" JA 1418-19. (Emphasis added.)

More than a dozen different neighborhoods, built by different residential development companies, are planned for Cainhoy. JA 929-937. It would have been much easier if the Corps had allowed the Defendant-Intervenors to sell their land to residential developers, and allowed the developers to apply for individual permits from the Corps—the normal residential development process. While the unitary permit approach was vastly more expensive and time-consuming for the Defendant-Intervenors, the thoughtful and careful approach of the Federal Defendants made environmental sense. Requiring one permit—which took a decade to obtain—allowed the Corps and FWS to have greater control over the project.

In May 2022, the Corps issued a permit to fill less than five percent of the wetlands on Cainhoy pursuant to section 404 of the Clean Water Act, 33 U.S.C. § 1344. JA 1286. The Appellants filed suit on August 17, 2022. JA 7. The

Appellants did not move for a preliminary injunction until two years later, and some 260 acres under active development were timbered by March 31, 2023, when the Corps reinitiated consultation with FWS due to the listing of the northern long-eared bat (NLEB) as an endangered species. JA 11-12.

Despite the fact that the NLEB has never been sighted or detected on Cainhoy, the Defendant-Intervenors voluntarily agreed to pause development at the request of the Federal Defendants so FWS could study the effects of the development on the NLEB and issue a second biological opinion. *Id.* This voluntary stay lasted from April 2023 through July 2024. *Id.* During this 15-month period, the Defendant- Intervenors could not conduct any development activities on Cainhoy, or even timber any trees for harvest that were unrelated to the development.

On July 2, 2024, FWS issued a second biological opinion that concluded the Cainhoy development will not jeopardize the continued existence of any endangered species. JA 105-252. On July 12, 2024, the Corps issued an amended permit that included additional special conditions that FWS recommended in the biological opinion to protect wildlife on Cainhoy. JA 253-259. On July 26, 2024, the Appellants filed an amended complaint. JA 12-13 at No. 48.

Since the amended permit was issued in July, the Appellants have filed four motions for injunctive relief before two federal courts, and these motions have been

denied.  On August 1, 2024, the Appellants moved for a preliminary injunction in district court.  *Id.* at No. 49.  After voluminous briefing and a lengthy hearing, the district court denied the Appellants' Motion for a Preliminary Injunction on September 19, 2024.  *Id.* at No. 76.  The district court found that the Appellants failed to satisfy *any* of the four factors that must be met for injunctive relief.  *Id.* The Appellants then moved for an Injunction pending Appeal, and the District Court denied this second Motion for an Injunction on September 24, 2024.  *Id.* at No. 78.  On September 27, 2024, the Appellants filed a Motion for Injunction Pending Appeal and an Emergency Injunction before this Court.  *Id.* at No. 79.  On October 8, 2024, this Court denied the Motion for an Injunction pending Appeal. *Id.* at No. 83.

As will be discussed below, since the amended permit was issued in July, four home builders have started or continued building homes on Cainhoy, including a retirement community, and this construction is ongoing.  Clements Ferry Road is the main thoroughfare on Cainhoy, and Berkeley County recently completed the widening of this road to four-lanes to accommodate traffic in the area, including Cainhoy.  The Medical University of South Carolina (MUSC) has started construction on an 80,000 square-foot medical center that will employ 30 doctors to meet the future medical needs on Cainhoy.  Another public school will close on the purchase of land on Cainhoy in early December.

## A.  Legal framework

"Claims challenging federal agency action under the CWA and NEPA are subject to judicial review under the APA." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). Under 5 U.S.C. § 706(2)(A), courts must uphold an agency's policymaking or fact-finding decision unless it is "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law."

As the Fourth Circuit has emphasized, "review under this (APA) standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley*, 556 F.3d at 192. The reviewing court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## LEGAL STANDARD

"In challenging the district court's denial of preliminary injunctive relief"—always "an extraordinary remedy"—"Plaintiffs shoulder a heavy burden on appeal." *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024). That burden is made even heavier because they must "overcome a deferential standard of appellate review," as this Court "review[s] the denial of a preliminary injunction for whether the record shows an abuse of discretion by the district court"—and reviews factual findings only "for clear error." *Id.* at 210.

"A party seeking a preliminary injunction faces an exceedingly high burden." *Mahmoud v. McKnight*, 102 F.4th 191, 203 (4th Cir. 2024). In *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), the Supreme Court recognized that "[a]

preliminary injunction is an extraordinary remedy never awarded as of right." Under *Winter*, a plaintiff seeking a preliminary injunction must establish all four of the following criteria: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary injunctive relief; (3) the balance of equities tips in the plaintiff's favor; and (4) the injunction is in the public interest. *Id.* at 20. A plaintiff must make a *clear* showing that it is likely to succeed on the merits of its claim, and a plaintiff must make *clear* showing that it is likely to be irreparably harmed absent injunctive relief. *Id.* at 20-22.

## ARGUMENT

### I. The District Court correctly found that the Appellants were not likely to succeed on the merits of their ESA claims because a habitat surrogate was necessary in this case.

Under 50 C.F.R. § 402.14(i)(1)(i), a habitat surrogate may be used to express the amount of anticipated take if three conditions are met: the biological opinion (1) describes the causal link between the surrogate and take of the listed species; (2) explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species; and (3) sets a clear standard for determining when the level of anticipated take has been exceeded.

#### A. *The absence of NLEBs on or near Cainhoy shows that it is not practical for the BioP to have a numeric take limit for NLEBs or to monitor the take of this species.*

In the district court, the Appellants claimed--without any support--that "the NLEB populations at the Cainhoy site are critical to the recovery of the species."

JA 65.  This inaccurate and extravagant claim is contradicted by the record.  As the district court found, there is no evidence that this non-indigenous, cold-weathered, cave-dwelling bat has ever been present on Cainhoy.  JA 1031.  In the environmental assessment, the Corps found that "no [NLEBs] have been seen onsite, nor are there … known hibernacula, winter roost sites, or known maternity roost trees on the property."  JA 1049.

In the district court, the Appellants relied on a study by the South Carolina Department of Natural Resources (SCDNR) that found a mere 33 NLEBs in coastal South Carolina over a four-year period from 2016 through 2019.  JA 12-13 at exhibit 15.  The SCDNR monitors endangered species, including the NLEB, on a county-by-county basis, and it updates this data on a regular basis. According to the SCDNR, the last detection of a NLEB in Berkeley County (where Cainhoy is located) was in 2018 when less than a dozen were found.  JA 464.  This SCDNR data is consistent with recent acoustic surveys on 1,500 acres at Cainhoy that did not detect a single NLEB, as discussed below.

Since 2019 when only three NLEBs were found, the Appellants cite no additional NLEB detections anywhere in coastal South Carolina, despite SCDNR continuing to "search for other [NLEB] populations along the upper and lower coastal plains to better delineate the range of this federally threatened species in the

state."[1]  As the district court found: "The last recorded NLEB sighting in coastal South Carolina occurred in … 2019." JA 1015.  The Appellants do not dispute this fact, and the district court's factual finding that "no NLEBs have ever been spotted at Cainhoy" is not clearly erroneous.

The Appellants base their appeal of the denial of the preliminary injunction in large part on *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260 (4th Cir. 2018). *Sierra Club* held that where practical, federal agencies should establish a numeric species limit in an Incidental Take Statement (ITS).  However, after voluminous briefing and a hearing on the Injunction, the district court found that "[t]he facts here are clearly distinguishable" from *Sierra Club*.  JA 1031.

First and foremost, this case is distinguishable from *Sierra Club* regarding the presence of NLEBs.  Unlike in coastal South Carolina, NLEBs are native to West Virginia and were present in the action area in *Sierra Club. Id.* at 281.  Large numbers of NLEBs are common in States where NLEBs are indigenous and where caves and mines are prevalent.  According to the evidence presented in district court, less than three dozen NLEBs have ever been detected in the four million acres in coastal South Carolina.  JA 526-28.  In contrast to the known presence of NLEBs in *Sierra Club*, the district court found that "[t]here has been no documented NLEB sighting in the Cainhoy area." JA 1015.

---

[1] *See* www.dnr.sc.gov/wildlife/bats/NLEB.html

As shown at the Injunction hearing, in the last 18 months, the Defendant-Intervenors and another developer conducted acoustic surveys for the NLEB on 1,500 of the 3,906 acres that will be developed on Cainhoy, and not one NLEB was detected. JA 1507. The district court found that "Defendant-Intervenors retained two engineering firms to conduct acoustic surveys of swaths of the Cainhoy property, which did not detect any NLEBs in the survey area." JA 1015-16. The district court concluded that "[u]nlike in *Sierra Club*, where there was an identified NLEB hibernaculum within the range of the pipeline, no NLEBs have ever been spotted at Cainhoy." JA 1031. The absence of NLEB populations on or near Cainhoy proves that a numeric species trigger is not practical and distinguishes this case from *Sierra Club*.

In response to their claims about the necessity of a numeric species trigger in the biological opinion, the district court asked the Appellants a simple question at the hearing: *"How would you count something you can't find?"* JA 974-75. (Emphasis added.) The district court hit the nail on the head when it told the Appellants at the hearing: "You can't find any [NLEBs on Cainhoy]. You want them to put a number on -- when they can't find any in the area? I mean, you've got a generous presumption that they're there, and now you want them to count the bats that aren't known to be there?" *Id.* The district court found that "Federal Defendants imposed additional mitigation conditions on Developers based on their

agreement to assume that NLEBs may be present in the action area, *notwithstanding that no NLEB has ever been found in Cainhoy and no NLEB has been seen in the neighboring 263,904 acre Francis Marion National Forest since 2019."* JA 1033. (Emphasis added.)

This Court and others have upheld the use of habitat surrogates in similar circumstances to this case. *See Appalachian Voices v. United States Dep't of Interior,* 25 F.4th 259, 281 (4th Cir. 2022) (upholding habitat surrogate for logperch and darter when FWS determined that an individual-based limit was impractical); *Miccosukee Tribe of Indians of Fla. v. United States*, 697 F. Supp. 2d 1324, 1332 (S.D. Fla. 2010) (holding that the "unavailability or unreliability of population data increases the likelihood that use of a habitat marker will be permissible because of impracticality."); *Northwest Envtl. Def. Ctr. v. Nat'l Marine Fisheries Serv.*, 647 F. Supp. 2d 1221, 1237–38 (D. Or. 2009) (upholding use of ecological surrogate where it was impossible to estimate the population of salmonids); *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs,* 538 F. Supp. 2d 242, 257 (D.D.C.2008) (upholding use of an ecological surrogate for the tidewater gray fish because of difficulties in determining population numbers); *Heartwood v. Kempthorne,* No. 1:05-cv-313, 2007 WL 1795296, at *20 (S.D. Ohio 2007) (upholding use of a habitat proxy for Indiana bats because of the gaps in scientific data and difficulties in estimating their numbers and location); *City of Santa Clarita*

*v. U.S. Dep't of Interior,* No. CV:02-00697, 2006 WL 4743970, at *13 (C.D. Cal. 2006) (upholding use of habitat surrogate for threespine stickleback because of unavailability of population data); *Sierra Club v. U.S. Fish & Wildlife Serv.,* No. 2:20-CV-13-SPC-NPM, 2023 WL 7188933, at *1 (M.D. Fla. Nov. 1, 2023) (upholding use of a habitat surrogate for the Florida panther where setting numerical take was not practicable).

The Defendant-Intervenors' decision to assume presence of the NLEB was indeed "generous," as the district court found. The Defendant-Intervenors chose the more environmentally conscious course of mitigating and minimizing impacts to NLEBs as if they were present on Cainhoy. These measures will protect NLEBs if they migrate to Cainhoy in the future and will protect the non-endangered bats that are present at Cainhoy. Special Condition 4 in the amended permit is particularly robust, as it prohibits timbering trees on Cainhoy seven months of the year to protect bats during roosting and torpor seasons.

By contrast, if the entire action area were surveyed for NLEBs and none were found – the likely outcome – the Defendant-Intervenors would not be required to provide any mitigation for NLEBs on Cainhoy. The district court touched upon this issue when he asked the Appellants at the hearing: "So they just stop the development until they find bats? And if they don't find bats?" JA 1004. This result would provide no protection for the non-endangered bats that are present on

Cainhoy, and it would provide no protection for NLEBs that might migrate to Cainhoy in the future.  In short, assuming presence of the NLEB provided more protection for the species.

The Appellants inaccurately state that at the beginning of the Section 7 consultation in 2023, "the Service recommended that Developers survey the property for bats.  But Developers did not want to survey."  Appellant Brief at 9-10.  This is demonstrably false and should be disregarded by this Court.  In support of this misleading claim, the Appellants cite a letter from FWS to the Corps that recommended surveys; this letter was <u>not</u> to the Defendant-Intervenors.  The Federal Defendants recommended that the Defendants-Intervenors either assume presence and mitigate for the NLEB as if it were present, or prove the absence of NLEBs by surveying all 9,076 acres on Cainhoy.

Surveying all 9,076 acres on Cainhoy, at the end of a decade-long permitting process, was not practical for two reasons: First, it was estimated to take least at least two years to survey the entire tract given the vast size of Cainhoy and the large number of wetlands therein. As described in the biological assessment: "Due to the 123 acre maximum survey area, approximately 75 surveys would be necessary to cover the +/-9,076 acre project area. The amount of time that would be required to plan and execute approved surveys, manually vet/qualitatively analyze the data and coordinate results with USFWS would render this project infeasible."  JA 1281.

This is especially true given that (1) acoustic surveys are weather dependent and cannot be conducted when it rains or when it is windy; and (2) it is impractical to survey all of Cainhoy because of the 9,076 acres, approximately 4,529 acres are wetlands, some of which are dense swamps and marsh. Surveying these swamps and marshes for NLEBs would be impractical, as well as unnecessary, given these areas will not be developed and will continue to constitute suitable bat habitat. !

By the time the NLEB was listed as endangered on March 31, 2023, the Defendant-Intervenors had spent more than a decade in the permitting process, which was near completion. The Defendant-Intervenors, their investors, and their developer clients could not be expected to wait additional years to survey the entire tract for the NLEB, which had just been uplisted and has never been seen on Cainhoy. Thus, it made practical <u>and</u> environmental sense to assume presence of the NLEB and provide mitigation and protection for this species as if it were on Cainhoy.

At the injunction hearing when the Appellants complained that not all of Cainhoy had been surveyed for NLEBs, the Court offered them this opportunity:

> THE COURT: Well, you know, you say that. You know, at any point, Ms. Wannamaker -- this case has been pending for quite a while, a couple years, and the biological opinion since 2023. I think you know me well enough that, had you asked me for access to the property to inspect yourself, I would have granted that.
>
> MS. WANNAMAKER: Yes. Well --

THE COURT: You didn't do it.

MS. WANNAMAKER: **We could not go out and survey this whole 9,000-acre property. I mean, there's no way that we could have surveyed the 9,000 acres.** JA 962. (Emphasis added.)

Later in the hearing, the Court asked: "If following this motion, the plaintiffs wanted to do their own survey [for NLEBs], I would take it the government and the intervenors would not object?" JA 979-80. The Defendant-Intervenors agreed, yet the Appellants have shown no interest conducting such surveys – even limited surveys -- to support their unfounded claim that "the NLEB populations at the Cainhoy site are critical to the recovery of the species." The Appellants' admission that "there's no way that we could have surveyed the 9,000 acres" is damning and shows that it is impractical to survey all of Cainhoy within a reasonable time-frame.[2]

In any event, the Appellants put too much stock in acoustic surveys in this case. Acoustic surveys document only the presence or absence of bats and cannot document the number of bats. As FWS made clear in an affidavit to the district court, even if all 9,037 acres had been surveyed and confirmed the presence of

---

[2] The lead Plaintiffs, the Coastal Conservation League, and the Southern Environmental Law Center, have combined net assets of nearly $220 million and could easily afford to conduct acoustic surveys on Cainhoy. JA 933. In fact, the Southern Environmental Law Center is paying to have drones fly over Cainhoy on a regular basis to record the progress of the development. JA 14 at No. 57, Exhibit 1 & JA 14 at No. 62, Exhibit 2.

NLEBs in the project area, FWS would have required the same avoidance and minimization measures for NLEBs. JA 581 at ¶ 17. By contrast, had the entire 9,037 acres had been surveyed and confirmed the absence of NLEBs – the likely outcome -- no mitigation would have been required. It is puzzling why the Appellants are critical of the Federal Defendants and the Defendant-Intervenors for taking the most environmentally cautious approach to the NLEB.

Further, the Appellants provide no explanation for how a numeric species trigger for NLEBs could be monitored on Cainhoy. In States like West Virginia, NLEBs hibernate in caves and mines, which allows bat populations to be counted in these hibernaculum.[3] To put things in perspective, in 2021, the West Virginia Department of Natural Resources found a single cave in West Virginia that harbors nearly 13,000 endangered Virginia bats each winter.[4] *See also Water Legacy v. USDA Forest Serv.,* No. 17-CV-276 (JNE/LIB), 2019 WL 4757663, at *17 (D. Minn. Sept. 30, 2019) (An "estimated 3,000 northern long-eared bats are thought to hibernate" in a single mine.). By contrast, there are no hibernaculum such as caves and mines at Cainhoy. In areas without caves or mines like Cainhoy, if a NLEB were taken, it is highly unlikely that the take would be detected given these

---

[3]*See* www.fws.gov/species-publication-action/endangered-and-threatened-wildlife-and-plants-endangered-species-
[4]See wvdnr.gov/wpcontent/uploads/2021/05/BatsOfWestVirginiaBrochure.pdf

bats weight only 0.2 ounces and are widely dispersed outside of hibernaculum.[5]

Had FWS set a numerical take limit for NLEBs on Cainhoy, it would have been

meaningless because any take would go undetected. In short, a numeric species

trigger is impractical in cases like this where it is impossible to monitor the take of

the species.

   In addition to *Sierra Club*, the Appellants cite several other cases where

federal courts invalidated incidental take statements that used a habitat surrogate

instead of a numeric take limit for the species.  Appellant Brief at 21.  In each of

these cases, however, it was undisputed that the endangered species were present

in the action area, unlike in this case.  *See Oregon Nat. Res. Council v. Allen*, 476

F.3d 1031, 1033 (9th Cir. 2007) (federal forests where timbering would occur

"housed the northern spotted owl"); *Ctr. for Biological Diversity v. Bureau of Land

Mgmt.,* 422 F. Supp. 2d 1115, 1138 (N.D. Cal. 2006) (undisputed that endangered

desert tortoises were present in the action area, which was federal land); *Nat. Res.

Def. Council, Inc. v. Evans*, 279 F. Supp. 2d 1129, 1187 (N.D. Cal. 2003)

(undisputed that sea turtles, whales, and other endangered marine species were

present in the action area).  The Appellants do not cite a single case where a numeric

take limit was used in a biological opinion when it was unclear that the endangered

species was present in the action area.

_____

[5]*See* [www.fws.gov/species/northern-long-eared-bat-myotis-septentrionalis](www.fws.gov/species/northern-long-eared-bat-myotis-septentrionalis)

**B.     The BioP sets a clear standard for determining when the level of anticipated take has been exceeded.**

This case is further distinguishable from *Sierra Club* regarding the habitat surrogate and the Incidental Take Statement. In *Sierra Club,* this Court held that FWS did not craft a "true" habitat surrogate. 899 F.3d at 279. The *Sierra Club* Incidental Take Statement (ITS) not only arbitrarily defined a geographical area, but it limited take to a "small percentage" of bats within each geographic area. As this Court in Sierra Club noted: "Although the geographic bounds are fixed, the pipeline can *only take a subset of individuals located within those bounds*. And it is impossible to know how many bats constitute a 'small percent.' Therefore, there is no clear and enforceable standard of take." *Id.* at 281. (Emphasis in original).  The *Sierra Club* ITS was the worst of both worlds—it contained a habitat surrogate with arbitrary geographic bounds, and then used a vague multiplier to reduce the number of acres of bat habitat. *Id.* at 274. Due to the "vague and unenforceable limits," there was no way to know when the "take" of either bats <u>or</u> acres triggered the reinitiation of consultation.  *Id.* at 272–73.

The Cainhoy ITS does not suffer from these flaws.  The habitat surrogate in the Cainhoy ITS and the specific special conditions in the amended permit set a clear trigger for determining when the authorized take has been exceeded.  If the Defendant-Intervenors clear one additional acre or fail to comply with any special condition in the amended permit to protect wildlife, then the Federal Defendants will

reinitiate consultation immediately per 50 C.F.R § 402.14.(i)(4).  In distinguishing

this case from *Sierra Club*, the district court found:

> Rather than offer a vague habitat surrogate with no enforceable trigger for reinitiation of consultation, Federal Defendants here explained the connection between seasonal clearing and limiting take of the NLEBs, the reasons why quantifying take of the NLEBs was impracticable in the expansive action area and set clear triggers for reinitiation of environmental consultation, including any failure by Developers to comply with the terms and conditions of the Amended Permit and exceeding restrictions on clearing.  JA 1031.

The district court's detailed factual findings regarding the sufficiency of the habitat

surrogate for Cainhoy are not clearly erroneous.

> ### C.  *The BioP describes the causal link between the habitat surrogate and take of NLEBs.*

The Appellants claim that the "Biological Opinion fails to establish a causal

connection between the habitat surrogate and take of Bats" because the habitat

surrogate is "co-extensive with Developers' plans."  Appellant Brief at 41.  This

confusing argument fails because it ignores the fact that the habitat surrogate is only

3,906 acres, and the Defendant-Intervenors are placing the rest of Cainhoy in

restrictive covenants and conservation easements.  The Defendant-Intervenors will

develop at most 3,906 acres of the 9,037-acre property and will preserve the

remainder, including 95 percent of the wetlands on Cainhoy.  Pursuant to the

amended permit, the Cainhoy timber operations will permanently cease in the areas

of the property outside the 3,906 acres, which seems to be lost on the Appellants.

Even the Court in *Sierra Club* found that "FWS has demonstrated a causal link" between the NLEB and the habitat surrogate acreage listed in the Incidental Take Limit. *Id.* at 281.

This case is distinguishable from Sierra Club in other respects as well. Cainhoy is private property, and it has operated as a family timber farm for the last 90 years. By contrast, in *Sierra Club,* the defendant-intervenor planned to build a 600-mile gas pipeline on federal and state lands in West Virginia, Virginia, and North Carolina, including two national forests, the Appalachian National Scenic Trail, the Blue Ridge Parkway, and the endangered Virginia Bat Recovery Unit. *Id.* at 265-67. Unlike the private property on Cainhoy, the pipeline in *Sierra Club* involved government property, and it was a major federal action under NEPA. Further, the pipeline in *Sierra Club* was highly controversial and opposed by numerous state and local governments. By contrast, state and local governments strongly support the development on Cainhoy and have invested millions in infrastructure on the property. As described earlier, the City of Charleston annexed Cainhoy and asked the Defendant-Intervenors to allow their private property to be developed so the City could expand. The district court's factual finding that "[t]he facts here are clearly distinguishable" from *Sierra Club* was not clearly erroneous.

The Appellants also argue that FWS has set numeric take limits for endangered bats in other biological opinions. Appellant Brief at 25 & 30. This is

true, but these biological opinions occurred in states where these bats are indigenous, unlike South Carolina. For example, in addition to the Cainhoy biological opinion, FWS issued two other biological opinions in South Carolina since the listing of the NLEB as an endangered species. Both of these biological opinions used a habitat surrogate in the incidental take statement, citing the same reasons and justifications as in this case. JA 465-498. In both biological opinions, NLEB presence was assumed, and no surveys were conducted to attempt to determine a specific count of NLEBs that would be taken. *Id.* Upon information and belief, FWS has never issued a biological opinion in South Carolina that set a numeric take limit for NLEBs because it is impractical to do so.

The issue of habitat surrogates is complex. But as this Court has ruled: "[e]specially in matters involving not just simple findings of fact but complex predictions based on special expertise, 'a reviewing court must generally be at its most deferential.'" *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). Given these complex facts regarding habitat surrogates — and the difficulty of providing a numeric species trigger and monitoring the take of NLEBs in an area where it has not been found — this Court should defer to the District Court and the expert agencies.

In summary, the Appellants must make a *clear* showing in the district court that they are likely to succeed on the merits of its claim that the biological opinion

was invalid. In this Court, the "Plaintiffs shoulder a heavy burden on appeal" and must show that the district court abused its discretion in denying the preliminary injunction. *Pierce*, *supra* at 209-210. Despite this heavy burden of proof, the Appellants provide no evidence that the biological opinion is deficient. As the district court noted: "I was struck that the only -- that I didn't have any scientific support challenging the biological opinion. You know, this issue has been floating around since July of '23." JA 34.

## II. The District Court correctly found that the Appellants were not likely to succeed on the merits of their NEPA claims.

### A. The Federal Defendants took the required "hard look" at the environmental consequences of the Cainhoy Development, and found there is nothing to be gained from an Environmental Impact Statement.

The National Environmental Protection Act ("NEPA") imposes procedural requirements on federal agencies to take a "hard look at environmental consequences" of proposed federal actions. *Winter,* 555 U.S. at 23. "Because NEPA is a procedural and not a results-driven statute, even agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs." *Ohio Valley*, 556 F.3d at 191. As the Fourth Circuit has summarized:

> NEPA requires only that federal agencies prepare an Environmental Impact Statement for "major Federal actions significantly affecting the quality of the human environment" … Where it is not readily discernible how significant the environmental effects of a proposed

action will be, federal agencies may prepare an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4(b) (2008). An EA is a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact [("FONSI")]."

*Id.* at 191; *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010) ("An agency need not complete an EIS for a particular proposal if it finds, on the basis of a shorter 'environmental assessment' (EA), that the proposed action will not have a significant impact on the environment."). "An agency's decision to rely on an Environmental Assessment instead of preparing an Environmental Impact Statement is entitled to deference from the courts." *Mt. Lookout-Mt. Nebo Prop. Prot. Ass'n v. FERC*, 143 F.3d 165, 172 (4th Cir. 1998).

"Even where an EA determines that a proposed action will have a significant environmental impact, an agency may avoid issuing an EIS where it finds that mitigating measures can be taken to reduce the environmental impact of the project below the level of significance." *Ohio Valley*, 556 F.3d at 191–92. "In these situations, the agency can issue a so-called mitigated FONSI." *Id.* at 192.

The Federal Defendants took the required "hard look" at this project. As noted earlier, the Corps required the Defendant-Intervenors to apply for a single permit for all 9,076 acres on Cainhoy instead of allowing them to sell their property to multiple developers and allowing the developers to apply for permits. The Defendant-Intervenors started the permitting process in 2012; applied for the 404 permit in 2018; and received the permit in 2022. The administrative record is

30,000 pages in this case, and the environmental assessment is 221-pages. As the district court noted, there have been two biological assessments, two biological opinions, two Section 7 consultations, two environmental assessments, and a permit and an amended permit. *See Winter,* 555 U.S. at 23 (finding the federal defendants took a "hard look at environmental consequences" under NEPA "as evidenced by the issuance of a detailed, 293–page EA").

After reviewing the environmental assessment and the biological opinion, the district court described at length the "hard look at the environmental consequences" that the Federal Defendants took in issuing the Cainhoy permit. JA 967-972. The district court noted that the Federal Defendants took six years in reviewing the permit and required the Defendant-Intervenors to make substantial changes to the project during this period. *Id.* After reviewing the biological opinion and Appellants' arguments, the district court found that "Plaintiffs do not grapple with the rationality of Federal Defendants' determination that proposed protective measures for the RCWs and NLEBs, including continued efforts to translocate the RCWs and the development of a bat monitoring program, mitigate any material adverse effect on these species. JA 1022. The district court found that "[t]his process has been prolonged and deliberate." JA 974.

The Appellants list a litany of issues that they claim require an EIS, yet none has merit. First, the Appellants claim that the Cainhoy development "is expected"

to result in the take of NLEBs, and the "destruction of thousands of acres of potential 'refugium' habitat for the bats." Appellant Brief at 37. But as noted earlier, NLEBs have never been sighted on Cainhoy. Regarding habitat loss, the district court found that as "the basis for its no jeopardy determination, the Corps cites the *de minimis* impact of tree removal on the potential habitat of the NLEBs, in light of the 12.86 million acres of forest land in South Carolina as of 2019, of which the action area comprises approximately 0.003%." JA 1027-28. The district court noted that "some 263,904 acres of which are protected land within the neighboring Francis Marion National Forest—is substantial when compared to the 3,906 acres subject to development …" *Id.* There are four million acres on the South Carolina coast alone (Jasper, Colleton, Beaufort, Charleston, Berkeley, Georgetown and Horry Counties), and the 3,906 acres on Cainhoy that will be developed over decades represent only .000975 of the total acres in coastal South Carolina. JA 431. In the environmental assessment, the Corps concluded that it "has not identified any impacts to federally protected species that it would recognize, let alone characterize, as highly controversial for purposes of NEPA." JA 1379-80.

As FWS explained in the final rule that listed the NLEB as endangered, white-nose syndrome "has been the foremost stressor on the northern long-eared bat for

more than a decade and continues to be currently."[6] The only other definitive stressor for the NLEB that FWS listed was "wind energy-related mortality."[7] The FWS concluded that "habitat loss alone is not considered to be a key stressor at the species level, and habitat does not appear to be limiting."[8] As one district court found, "development actions have shown no negative impacts to northern long-eared bat populations." *Indigenous Env't Network v. United States Dep't of State*, 347 F. Supp. 3d 561, 589 (D. Mont. 2018). The Appellants' claims regarding habitat loss lack merit and do not support an EIS.[9]

Second, the Appellants claim that the Cainhoy development "will place thousands of new homes" in a flood-prone area. Appellant Brief at 39. This argument is ironic because one reason that the Cainhoy development has enjoyed such strong support from the City and the County is that it is less likely to flood than other areas in Charleston. The Corps carefully considered flooding and found that "Cainhoy also has strong resiliency because of its high percentage of wetlands

---

[6] *See* Endangered and Threatened Wildlife and Plants; Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 73488, 73501 (Nov. 30, 2022).
[7] *Id.*
[8] *Id.*
[9] The Appellants' argument regarding habitat loss and the NLEB would decimate the forestry industry in South Carolina, which contributes $23.2 billion annually to the State's economy and provides more than 100,000 jobs and $5.5 billion in annual labor income. *See* www.scfc.gov/development/economic-development/#:~:text=Forestry%20is%20a%20pillar%20of,billion%20in%20annual%20labor%20income.

and its numerous direct outfalls to tidal waters that will minimize the potential for heavy rains to overwhelm its infrastructure." JA 1373.

The flooding and stormwater protections on Cainhoy will be designed by the same respected engineering firm that designed and implemented flooding protections on nearby Daniel Island, which was also developed by the Defendant-Intervenors. Daniel Island has a remarkable record of withstanding flooding due to excellent stormwater designs implemented by the Defendant-Intervenors. In 2015, South Carolina experienced historic flooding that caused significant damage to Columbia, Charleston, and much of the State. This "1,000 year storm" poured an estimated 18 inches of rain and 1.9 billion gallons of rainwater on Daniel Island in a short period—yet Daniel Island was spared the flooding that plagued downtown Charleston. JA 524-26. In 2016 and 2017, Hurricanes Matthew and Irma hit the Lowcountry, and again, Daniel Island withstood the flooding. JA 527-29.

Mayor Tecklenburg, an early resident of Daniel Island and a long-time supporter of the Cainhoy development, recently wrote that the thoughtful stormwater design on Daniel Island— which will be replicated on Cainhoy—"was a blessing compared to the other parts of the City that flooded on a regular basis." JA 462-63.

The Corps found that "the Cainhoy Development land is above average when compared to all lands within the City of Charleston." JA 1373. The City of

Charleston identifies areas within the municipal boundary that suffer from repeated flooding and designates such areas as "Special Protection Areas," and Cainhoy is not a Special Protection Area.[10]  Finally, Cainhoy must comply with the City of Charleston 2020 Stormwater Design Standards Manual (SDSM). The 2020 manual includes requirements to "restrict release of additional water," "design for bigger rainstorms," "design for future sea level rise," and "add special rules for areas with flooding."[11]  The Appellants' claims regarding flooding lack merit and do not support an EIS.

Third, the Appellants claims regarding wetlands also lack merit and do not warrant an EIS.  The 404 permit allows the Defendant-Intervenors to fill 181 acres of wetlands on a 9,076 acre property. Of this number, only 2.65 acres are the more environmentally valuable tidally-influenced wetlands. The 181 acres of wetlands are not contiguous and do not impact the functionality of wetland system on Cainhoy.

The Corps found that the Cainhoy development "results in a very low ratio of wetland impact per acre of development."  JA 1419.  After careful review, the Corps found that the "Applicants made every effort to minimize impacts to wetlands to the greatest extent possible" "and the Applicants' expressed desire for

---

[10] *See* www.charleston-sc.gov/DocumentCenter/View/25683/SWDSM-One-Page-Fact-Sheet?bidId=

[11] Id.

a conservation minded, environmentally sensitive true mixed use development, impacts have been reduced to those small areas of wetlands for road crossings and feasible lot development, and locating essential storm water ponds in wetlands." JA 1287-88.

Cainhoy has a 50-1 ratio for total acres (9,076) to wetland fills (181), and "for every 1 acre of wetland that is impacted … approximately 13 acres will be protected and/or enhanced." JA 1440. As the district court found, in mitigation for these 181 acres of wetland fills, the permit requires "the permanent protection of approximately 3,162.3 acres of diverse and ecologically significant uplands and freshwater wetlands via restrictive covenants and a conservation easement." JA Another approximately 1,200 acres of wetlands on Cainhoy are tidally-influenced wetlands and are protected under federal law. Moreover, the "most ecologically valuable portions of Cainhoy" were selected for permanent protection "specifically to offset the impacts of this project, and thereby reduce the proposed impacts below the level of significance." JA 1028.

Fourth, the Appellants criticize the potential for docks on Cainhoy, but these claims are speculative. The Appellants never raised the issue of docks at the injunction hearing, and dock permits in South Carolina are strictly regulated and issued by the South Carolina Department of Environmental Services, not the Federal Defendants. Further, the National Marine Fisheries Service commented on

potential docks at Cainhoy, and the Corps addressed their comments and noted that the Defendant-Intervenors will not apply for speculative dock permits and that individual lot owners must apply to the State for dock permits. JA 1316.

Fifth, the Appellants claim that the Cainhoy development will impact the Francis Marion National Forest (FMNF) by making prescribed burning more difficult and expanding edge habitat on the Forest. Appellant Brief at 42. But the Corps fully explained why the development would not affect prescribed burning in FMNF or on Cainhoy. JA 1383. The Defendant-Intervenors created and recorded an innovative prescribed burn easement that will prevent any future resident from objecting to prescribed burns in the FMNF or in the undeveloped portions of Cainhoy. *Id.* Regarding the border with the FMNF, the Defendant-Intervenors voluntarily placed approximately $3 million in land on its 2-mile border with the FMNF in restrictive covenants to prevent development and protect the Forest. This border ranges in width between 200 and 800 feet and is fully forested. JA 947 & 997-98.

Sixth, the Appellants claimed that the Cainhoy development "will contribute significantly more traffic and development to the surrounding area." Appellant Brief at 41. Yet as the environment assessment noted in 2018: "Within the past 10 years, the land use of the area has experienced a shift from largely rural and agricultural lands to residential use as the population of the City of Charleston

and surrounding areas continue to increase. SCDOT is constructing a road widening on Clements Ferry Road from two to four lanes, and a new bridge over the Wando River will allow for greater traffic flow and access to the property." JA 1294. As noted earlier and below, the County recently completed the widening of Clements Ferry Road to accommodate the traffic needs on Cainhoy. Further, the Appellants' reference to the Phillips Community is puzzling as it is located in a different city and county than Cainhoy.

*The Appellants do not cite a single case where an EIS was required for a private residential development like Cainhoy.* Nor can they dispute that this Court has rejected claims that an EIS was required in cases involving far more "major federal actions" than the private development on Cainhoy. *See, e.g.*, *Ohio Valley*, 556 F.3d at 191–92 (mountain top strip coal mining); *Mt. Lookout-Mt. Nebo,* 143 F.3d at 171–72 (hydroelectric power generation plant); *State of S.C. ex rel. Campbell v. O'Leary*, 64 F.3d 892, 897 (4th Cir. 1995) (shipment of spent nuclear fuel rods from Europe to South Carolina for storage); *Roanoke River Basin Ass'n v. Hudson,* 940 F.2d 58, 60–61 (4th Cir. 1991) (85-mile pipeline that would divert sixty 60 million gallons of water a day from Lake Gaston); *See also Atchafalaya Basinkeeper v. United States Army Corps of Engineers*, 894 F.3d 692, 703 (5th Cir. 2018) (162–mile crude oil pipeline through a basin with wetlands). If these projects did not require an EIS, then the residential development at Cainhoy cannot either.

The Appellants cannot show that the district court erred in finding that an EIS was not required, especially given that an attorney for the Appellants was the only one to request an EIS. Of all "the resource agencies" consulted by the Corps, none "requested for the Corps to prepare an EIS." JA 1383, n. 10. Neither did the City of Charleston, the County of Berkeley, the State of South Carolina, the Preservation Society of Charleston, the Historic Charleston Foundation, or the Lord Berkeley Land Trust. *Id.* This fact alone shows that the Corps reasonably found that an EIS was not required. *Compare Friends of Black Bay v. United States Army Corps of Engineers*, 681 F.3d 581, 590 (4th Cir. 2012) (finding that an EIS was required because "[t]he FWS specifically recommended preparation of an EIS as an alternative to denying the permit").

### III. The Appellants have not shown irreparable harm and cannot show that the district court was clearly erroneous in finding so.

The burden of proving irreparable harm is high: a "clear showing" of irreparable harm to be suffered by the plaintiff from a denial of the relief" is "a condition for the grant of a preliminary injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991); *see Winter*, 555 U.S. at 20. "[T]he required irreparable harm must be neither remote nor speculative, but actual and imminent." *Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 283 (4th Cir. 2002).

After voluminous briefing and a lengthy hearing, the district court found that "Plaintiffs are not likely to suffer irreparable harm in the absence of preliminary relief." JA 1033. The district court's finding is bolstered by the Appellants' delay in seeking relief, even though the purported harms they invoke now mirror those in their complaint two years ago. "[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (per curiam). A party's delay shows "an absence of the kind of irreparable harm required to support a preliminary injunction." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989). "Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Id.* (collecting cases demonstrating that a four-month or a year-long delay in seeking relief could preclude a preliminary injunction). This Court has determined that a nine-month delay in requesting preliminary injunctive relief was unreasonable, *id.* at 79–80, and other courts have made similar determinations.[12]

Here, the original permit for Cainhoy was issued on May 11, 2022. More than three months later, the Plaintiffs filed their original complaint challenging the same Cainhoy development on August 17, 2022. That complaint asserts the same harms

---

[12] *Rullan v. Goden*, No. 17-cv-3741, 2023 WL 3093406, at *2 (D. Md. Apr. 26, 2023) (collecting cases finding unreasonable delays as short as thirty-six to ninety-five days); *FS Med. Supplies, LLC v. Tanner Pharma UK Ltd.*, No. 23-cv-000598, 2023 WL 6812565, at *4 (W.D.N.C. Oct. 16, 2023) (six-month delay).

to the same members who now assert irreparable harm, and it alleged these harms were "imminent[] and irreparabl[e]." JA 7 at No. 1. Yet the Plaintiffs never moved for preliminary injunctive relief until over two years after the development was permitted. Nor can the Plaintiffs excuse the delay by pointing to the amended permit: development proceeded under the original permit on Cainhoy, resulting in the timbering of 260 acres prior to March 31, 2023, before work was paused. But the Plaintiffs never moved for immediate relief at any point during the nearly 11 months from the issuance of the original permit through the voluntary pause in work. That extended delay "standing alone" is sufficient to preclude preliminary injunctive relief. *Quince Orchard*, 872 F.2d at 80 (quoting *Citibank*, 756 F.2d at 276).

Further, a plaintiff must show that *he or she* will suffer *irreparable* harm, not that harm might generally befall someone or something else. *See Winter*, 555 U.S. at 20. And the irreparable harm must come from the *current proposed stage* of an action. *See, e.g.*, *S.C. Dep't of Wildlife & Marine Resources v. Marsh*, 866 F.2d 97, 100 (4th Cir. 1989). As another district court explained in a similar context:

> While Plaintiffs assert an interest in viewing and experiencing the forest in its "undisturbed state," conclusory allegations of an environmental injury, without more, are insufficient to meet the requirements for an injunction.

*Native Ecosystems Council v. Krueger*, 40 F. Supp. 3d 1344, 1349 (D. Mont. 2014).

Here, Appellants have provided "no evidence in the record" (*Mahmoud*, 102 F.4th at 212) that NLEBs are at Cainhoy or surrounding areas. *See* JA 1015. Moreover, unlike in *Native Ecosystems Council, supra,* the Appellants cannot even "assert an interest in viewing and experiencing the forest in its undisturbed state" because Cainhoy is a private timber farm where the Appellants do not have access. It is highly unlikely that any of the Appellants' members would ever see the remaining RCWs on Cainhoy because RCWs nest in the interior of the property and are not visible from the outside. It is even more unlikely that any of the Appellants' members would ever see NLEBs on Cainhoy because, as the District Court found, NLEBs have never been seen or detected on Cainhoy. JA 1015.

The Appellants' claims of irreparable harm are even weaker considering that they have access to the 263,000-acre Francis Marion National Forest (FMNF) and the 66,000-acre Cape Romain National Wildlife Refuge, both of which are close to Cainhoy. The Appellants claim that one of their members "enjoys kayaking in the marshes around Cainhoy" and "fears" he won't be able to "continue viewing and photographing wildlife." Appellant Brief at 44. However, this member can continue to kayaking in the marshes around Cainhoy because the development will not affect the federally protected saltwater marshes. This member can also kayak in the marshes around the Cape Romain National Wildlife Refuge, which is near Cainhoy and has more than 66,000 acres of pristine and undeveloped barrier islands

on the coast.[13]  The Appellants claim that another member enjoys viewing animals and endangered species in the FMNF, and he is "concerned" that the Cainhoy development will "deprive him from observing and enjoying these speculator specifies." *Id.*  Yet this makes little sense: how can the development of 3,906 acres on a private timber farm affect this member's ability to enjoy the federally-protected 263,000-acre FMNF, which is home to 563 clusters of RCWs and scores of other wildlife.[14]  *Cf. Friends of Animals v. United States Bureau of Land Mgmt.,* 232 F. Supp. 3d 53, 65 (D.D.C. 2017) ("a sufficient number of horses would likely remain in [the] area ... to satisfy Plaintiff['s] interest in observing and enjoying the wild-horse population.")

In summary, Cainhoy is private property, and the Appellants cannot clearly show any irreparable harm to their ability to look for wildlife *outside the development*, either in the FMNF or the other five wildlife refuges in coastal South Carolina.  The Supreme Court in *Winter* discounted similar claims: "For the Plaintiffs, the most serious possible injury would be harm to an unknown number of the [animals] that they study and observe"—an injury that was especially minor given "a low likelihood of" "sighting" the animals. 555 U.S. at 26, 28. The Appellants have no "likelihood" of "sighting" any endangered species on Cainhoy

---

[13] *See* www.fws.gov/refuge/cape-romain
[14] *See* www.fws.gov/story/2023-03/silver-lining-monster-storm.

because the public cannot access this private property.  It is hard to imagine any Appellants that have a weaker case of irreparable harm, and this fact alone defeats their Motion for an Injunction Pending Appeal.

Nor will the environment suffer irreparable harm absent an injunction. As discussed earlier, the 404 permit allows the Defendant-Intervenors to fill only 181 acres of wetlands on a 9,076 acre property, and "for every 1 acre of wetland that is impacted … approximately 13 acres will be protected and/or enhanced."  JA 1440. Regarding the Red-Cockaded Woodpecker, the Defendant-Intervenors have successfully translocated 27 groups of RCWs from Cainhoy to wildlife refuges and private lands in conservation easements.  JA  127-29.  The Defendant-Intervenors translocated these RCWs to different areas of the State that did not have a RCW population, including the ACE basin.  *Id.*  Not a single RCW has died during the translocations.  JA 13 at No. 53.  There are only nine RCW groups remaining on Cainhoy, and these will be translocated before development occurs per to the amended permit.  JA 187-88.  Pursuant to the ITS, the "take" of the remaining RCWs will be non-lethal.  *Id.*  And the RCW population has increased so much in recent years that FWS recently announced that the RCWs have been removed from the endangered species list.[15]

---

[15] *See* www.fws.gov/press-release/2024-10/downlisting-red-cockaded-woodpecker-endangered-threatened

In sum, the district court's finding that "I certainly don't believe [the Plaintiffs have] shown irreparable harm" was not clearly erroneous, and that finding alone justifies a denial of injunctive relief. JA 1012.

## IV. The Appellants cannot show that the district court was clearly erroneous in finding that the Balance of Equities and the Public Interest "weighs heavily in favor of the Defendants."

The Appellants' alleged irreparable harms are speculative, while the harms that an injunction would cause the Defendant-Intervenors are proven and severe. The Appellants wrongly assert that "any alleged housing benefits from this development are years away." Appellant Brief at 48. At the injunction hearing, the district court asked "when are we going to start building houses?" JA 992. The undersigned initially responded that there was not a set scheduled, but then asked for a brief moment, consulted with the Defendant-Intervenors and a representative from Pulte Del Webb, and informed the court that houses will be completed "within the next year, your Honor." *Id.*

Since the amended permit was issued in July, four home builders have started or continued the site-work for home construction on Cainhoy, including a retirement community, and this construction is ongoing. There are 22 single-family homes under construction on Cainhoy, and many others are scheduled to begin early next year. Clements Ferry Road is the main thoroughfare on Cainhoy, and Berkeley County recently completed the widening of this road to four-lanes to

accommodate traffic on Cainhoy.  The Medical University of South Carolina (MUSC) has started construction on an 80,000 square foot medical center that will employ 30 doctors to meet the future medical needs on Cainhoy.  Another public school will close on the purchase of land on Cainhoy in early December.  The Appellants seek this injunction to stop all "clearing and other site preparation and construction work" on Cainhoy, which would stop these homes from being completed for an indeterminate time.  JA 85.  A local television station and a local newspaper recently ran a stories documenting this progress on Cainhoy.[16]

If an injunction were entered, these home builders and the Defendant-Intervenors would suffer substantial damages that would not be recoverable.  JA 929-937.  These economic harms that "would not be recoverable" are vital considerations in the balance of equities. *Mountain Valley Pipeline*, 915 F.3d at 218 *see also Winter*, 555 U.S. at 27.  The District Court correctly found that "enjoining the development of the Cainhoy Project would not serve the public interest" in "expanding access to housing and healthcare."  JA 1034.[17]

---

[16] www. m.youtube.com/watch?v=PCrdd8JR0ZM; www.postandcourier.com/business/charleston-historic-home-sale-development-million/article_b967a27e-8d62-11ef-9550-270f94e8ca42.html

[17] Appellants note that they agreed to exempt MUSC from any injunction for the development.  Appellant Brief at 48.  They also agreed to exempt a residential developer named Woodfield, who is building a large apartment complex on Cainhoy.  Appellants agreed to do this because, as noted earlier, they failed to file

The Charleston metro area is in a severe housing crisis as the demand for housing far exceeds the supply.[18]  The district court recognized this at the hearing when it found that  "one of the problems we're facing today — we hear about it everywhere — is this great lack of inventory of affordable housing. And young people are struggling to find — not just young people — to buy a home of their own … *it is a particularly acute problem in the Lowcountry of South Carolina."*  JA 972. (Emphasis added.)   The district court further stated that "my law clerks all want to buy houses, okay. I mean, everyone is struggling with this issue." *Id.*  The district court concluded that "one of the benefits to the public from the [Cainhoy] project is the production" of 9,000 new homes.  *Id.* The district court's finding that the public interest "weighs heavily in favor of the Defendants" and against the injunction was not clearly erroneous.  JA 1034.

Since 2010, the population of the Charleston metro area has exploded, but the supply of housing has not kept pace.  "Between 2000 and 2020, home values grew 135 percent faster than homeowner incomes" in the Charleston metro area.[19]  While

---

for an injunction in a timely manner in 2022, and these parcels on Cainhoy were timbered before the amended complaint was filed.  Worse yet, the MUSC medical center will likely fail if Cainhoy is not developed because there not enough people on Cainhoy presently to support an 80,000 square foot medical facility.

[18]*See* www.charlestoncounty.org/hof/files/doclib/Housing-Our-Future-Public-Review.pdf at 15.

[19] *See* www.charlestoncounty.org/hof/files/doclib/Housing-Our-Future-Public-Review.pdf at 15.

the population has increased substantially, "the inventory of available homes has dramatically declined – in 2011, there was around 13 months of supply, while in March 2022, the for-sale inventory [was] at an all-time low with only one month of supply, driving prices up and keeping many would-be buyers in the rental market."[20] From 2011 to 2022, the median sales price in the Charleston area increased 124 percent.[21] The most recent statistics from the Trident Association of Realtors paint a bleak picture: In September 2024, the following were the <u>median</u> sales price of a house in the Charleston metro area: downtown Charleston $2.3 million; Daniel Island $2.0 million; Wando/Cainhoy $964,000; James Island $705,000; and West Ashley $521,000.[22]

In response to this housing crisis, as the district court found, Cainhoy offer 9,000 new housing units, including affordable rentals, and delaying the delivery of this new housing will adversely impact the public, as the district court found. As the Corps noted in the environment assessment, "other developable tracts of the size and proximity of [Cainhoy] to major travel corridors in around the City of Charleston are not available or reasonably attainable for development." JA 1413. The Corps further found that the "project will provide housing and commercial development opportunities and is proposed to include nature trails, bikeways and

---

[20] *Id.* at 33.
[21] *Id.*
[22] *See* www.charlestonrealtors.com/market-reports

footpaths that will provide recreational opportunities and access to parks, neighborhoods, schools, grocery stores, etc." (noting benefits "to the needs and welfare of the people," including "housing and commercial opportunities," accessibility, the "enhance[ment] of natural and cultural resources," and "educational opportunities"). JA 1443. In other words, the Cainhoy "project will improve the quality of life of thousands of people," a significant public interest. *Coastal Conservation League*, 2016 WL 6823375, at *20 (quoting *Rio Associates, LP v. Layne*, No. 3:15-CV-00012, 2015 WL 3546647, at *6 (W.D. Va. June 8, 2015)).

## CONCLUSION

The district court correctly found that the Appellants failed to meet any of the four required factors to obtain a preliminary injunction. The district court did not abuse its discretion in denying injunction relief. The Order below should be affirmed.

Respectfully Submitted,

November 6, 2024

s/ Rhett DeHart
M. Rhett DeHart (Fed. ID No. 7777)
Womble Bond Dickinson (US) LLP
5 Exchange Street
Charleston, SC  29401
Tel.  (843) 722-3400
RhettDehart@wbd-us.com

Attorneys  for  Intervenor-Defendants
Tract 1 Timber, LLC; Seven Sticks,
LLC; Tract 7, LLC; and Cainhoy Land
and Timber, LLC

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,550 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point font size, Times New Roman type style.

WOMBLE BOND DICKINSON (US) LLP

By: s/Rhett DeHart

*Attorneys for Intervenor-Defendants Tract 1 Timber, LLC; Seven Sticks, LLC; Tract 7, LLC; and Cainhoy Land and Timber, LLC*

November 6, 2024